<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

EMRETTA HINMAN and WILLIAM HINMAN,

               Plaintiffs,

v.

JOSEPH DELLO RUSSO, M.D., NEW JERSEY
EYE CENTER, JOHN DOES 1-10 and ABC
CORPORATIONS 1-10

               Defendants.

---

Civ. 03-768 (WGB)

<u>M E M O R A N D U M</u>
<u>O P I N I O N</u>

<u>APPEARANCES:</u>

Adam M. Slater, Esq.
Bruce Heller Nagel, Esq.
NAGEL RICE & MAZIE, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068

     Counsel for Plaintiffs

John Tomaszewski, Esq.
MARULLI & ASSOCIATES, P.C.
115 Broadway
19th Floor
New York, New York 10006

Steven Kern, Esq.
KERN, AUGUSTINE, CONROY & SCHOPPMANN, P.C.
1120 Route 22 East
Bridgewater, New Jersey 08807

Catherine J. Flynn, Esq.
LINDABURY, MCCORMICK & ESTABROOK, P.C.
P.O. Box 2369
Westfield, New Jersey 07091

     Counsel for Defendants

**BASSLER, SENIOR DISTRICT JUDGE:**

    On January 6, 2001, Defendant Dr. Joseph Dello Russo

performed Lasik surgery on Plaintiff Emretta Hinman's eyes.
Emretta Hinman and William Hinman (collectively as "Plaintiffs")
sued Dr. Dello Russo for malpractice because Mrs. Hinman
allegedly suffers from various vision problems as a result of the
surgery, including blurred vision, light sensitivity, decreased
visual quality and acuity, and seeing glare, halos and
starbursts. (See Testimony of Emretta Hinman at 1.40:21 -
1.41:16.)

Plaintiffs claim that Mrs. Hinman was not a viable candidate
for the Lasik surgery and that Defendants Dr. Dello Russo and the
New Jersey Eye Center, a wholly owned corporation, (collectively
as "Defendants") failed to obtain her informed consent. At the
close of the evidence, Plaintiffs moved for judgment as a matter
of law under Fed. R. Civ. P. 50(a) and the Court reserved
decision until after the jury verdict.[1] On February 10, 2006,
after a nearly two-week jury trial, the jury returned a verdict
in favor of Defendants.

Plaintiffs now move for renewed judgment as a matter of law
pursuant to Fed. R. Civ. P. 50(b), and in the alternative, for a

_____

[1] The post-verdict motion is a renewal of an earlier motion
made at the close of the evidence. A motion for judgment as a
matter of law, filed at the close of all evidence is a
prerequisite for a motion under Rule 50(b). Fineman v. Armstrong
World Indus., Inc., 774 F. Supp. 225, 230 (D.N.J. 1991), rev'd on
other grounds, 980 F.2d 171 (3d Cir. 1992) (quoting Associated
Bus. Tel. Sys. Corp. v. Greater Capital, 729 F. Supp. 1488, 1502
(D.N.J.), aff'd, 919 F.2d 133 (3d Cir. 1990)).

2

new trial pursuant to Fed. Civ. R. P. 59.[2]  For the following
reasons, the Court **denies** Plaintiffs' motion.

<u>DISCUSSION</u>

A.    <u>Renewed Motion for Judgment as a Matter of Law</u>

Federal Rule of Civil Procedure 50(b) provides:

> If, for any reasons, the court does not grant
> a motion for judgment as a matter of law made
> at the close of all the evidence, the court
> is considered to have submitted the action to
> the jury subject to the court's later
> deciding the legal questions raised by the
> motion.  The movant may renew its request for
> judgment as a matter of law by filing a
> motion no later than 10 days after entry of
> judgment -- and may alternatively request a
> new trial or join a motion for a new trial
> under Rule 59.  In ruling on a renewed
> motion, the court may:
> (1) if a verdict was returned:
>      (A) allow the judgment to stand;
>      (B) order a new trial, or
>      (C) direct entry of judgment as a
>          matter of law . . . .

"Whether the evidence presented at trial is sufficient to
create an issue of fact for the jury or will permit the court to
enter judgment as a matter of law is solely a question of law to
be determined by the trial court."  Charles Alan Wright & Arthur
R. Miller, <u>Fed. Prac. & Proc.</u> § 2524, at 250-51 (1995 ed.).  As

---

[2]  Pursuant to Fed. R. Civ. P. 50(c)(1), where the court has
granted judgment as a matter of law, the court must also
conditionally rule on a motion for a new trial in the event the
judgment is thereafter vacated or reversed.  <u>See</u> <u>Rhone Poulenc
Rorer Pharms. Inc. v. Newman Glass Works</u>, 112 F.3d 695, 698 (3d
Cir. 1997) ("When granting a motion for judgment as a matter of
law, the district court also is required to rule conditionally on
any motion for a new trial.")

3

explained by the Third Circuit:

> [A motion for judgment as a matter of law] should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.  Wittekamp v. Gulf & W. Co., Inc., 991 F.2d 1137, 1141 (3d Cir. 1993).  In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.  Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir. 1992), cert. denied, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).  Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability.  Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978) (citation omitted) (quotation omitted).

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

1.   Informed Consent

Plaintiffs argue that the evidence presented at trial established that Defendants failed to obtain Mrs. Hinman's informed consent.[3]  In Matthies v. Mastromonaco, the New Jersey

_____

[3]  A federal court sitting in diversity must apply state substantive law and federal procedural law.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); New Castle County v. Nat'l

Supreme Court reiterated that "[i]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable [her] to 'evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." 160 N.J. 26, 35 (1999) (citing Perna v. Pirozzi, 92 N.J. 446, 459 (1983)). "[T]he decisive factor is . . . whether the physician adequately presents the material facts so that the patient can make an informed decision." Id. at 36.

In order for a patient's consent to be deemed informed, the physician must disclose sufficient information regarding both recommended and non-recommended alternatives, including non-treatment. Id. at 38. "Otherwise, the physician, by not discussing these alternatives, effectively makes the choice for the patient." Id. "As with other medical malpractice actions, informed consent cases require that plaintiff prove not only that the physician failed to comply with the applicable standard for disclosure but also that such failure was the proximate cause of plaintiff's injuries." Largey v. Rothman, 110 N.J. 204, 215 (1988) (per curiam).

---

Union Fire Ins. Co., 243 F.3d 744, 749 (3d Cir. 2001); Chamberlain v. Giampapa, 210 F.3d 154, 158-62 (3d Cir. 2000) (applying New Jersey common law to action based on lack of informed consent). The Court will therefore address Plaintiffs' state law claims under New Jersey law as interpreted by the New Jersey Supreme Court.

Plaintiffs contend that a judgment as a matter of law should be entered in their favor on this issue for the following reasons: (1) Dr. Dello Russo failed to offer Mrs. Hinman alternative treatment options and accurately advise her of the surgical risks involved; (2) Dr. Dello Russo failed to disclose the increased risk of steepening Mrs. Hinman's corneas beyond 49 diopters; and (3) Dr. Dello Russo failed to provide Mrs. Hinman with the patient information book supplied to Dr. Dello Russo by the laser manufacturer.  (Plaintiffs' Brief at 4-9.)

Defendants respond that based on the evidence presented, a reasonable jury could have afforded more weight to Defendants' witnesses and could have concluded that Mrs. Hinman gave her informed consent to the procedure.

a.    Reasonable Treatment Alternatives and Risks

Plaintiffs argue that Defendants failed to offer Mrs. Hinman alternative medically reasonable treatments and failed to accurately disclose to her the risks of permanent side effects. Plaintiffs' argument is predicated on the assumption that Mrs. Hinman's vision problems placed her at a greater risk of complications,[4] thereby demanding more information from Dr. Dello Russo.  In response, Defendants maintain that in addition to her

---

[4]  Prior to undergoing Lasik surgery, Mrs. Hinman suffered from astigmatism and hyperopia or farsightedness.  She also had a lazy right eye.  (See Testimony of Emretta Hinman at 6.53:13-17.)

signing an informed consent form,[5] Dr. Dello Russo and his nurse

_____

[5] Mrs. Hinman initialed each of seven pages of the New Jersey Eye Center's Informed Consent Form.  She also signed the last page certifying that she had read the Form's information and understood its contents.  The Informed Consent Form provided in relevant part:

> Treatment Guidelines:
> Inclusions: Patients treated should be over 21 years of age . . . who have nearsightedness, farsightedness and/or astigmatism.
> Alternative treatments: Patients must have rejected alternatives to [Lasik], which include no surgery, glasses, contact lenses, and other refractive procedures such as Radial Keratotomy or standard surface PRK.
> * * *
> Patient Consent:
> 1.   I understand the basic nature of the procedure as well as the possible risks and benefits of [Lasik].  My doctor has answered all questions to my satisfaction.  I understand that it is impossible for the doctor to inform me of every conceivable complication that may occur.
> 2.   I understand that the correction obtained may not eliminate all of my myopia, hyperopia and/or astigmatism and that, although infrequent, <u>additional correction with glasses, contact lenses or further surgery may be needed.</u>
> 3.   I understand that, as with any form of surgery the outcome can never be guaranteed . . . .
> 4.   I understand that as a result of surgery using the Excimer Laser there is a small risk that my vision may be made worse. (0.22 % at the end of 1999).
> * * *
> 6.   Although extremely rare, complications that may occur are the following: . . . decrease in best corrected vision, night glare or halos . . .  Although vision-threatening complications are quite rare, it is possible that if a

7

personally advised Mrs. Hinman of different treatment options and the dangers of the surgery.

Without any citations to the record, Plaintiffs argue that a clear lensectomy was a viable alternative that was not presented to Mrs. Hinman before the Lasik procedure.  To support this claim, Plaintiffs distort the testimony of their expert, Dr. Cary Silverman, by arguing that he "testified that a clear lensectomy was a medically reasonable alternative to Lasik and would have posed a lower risk of problems since there would not be so much steepening of [Mrs. Hinman's] cornea." (Plaintiffs' Brief at 4.)

The truth is that Dr. Silverman only testified that a clear lensectomy is a possible corrective surgical option for Mrs. Hinman's <u>current conditions</u>.  He did not testify that it was an

---

significant reduction in vision is produced as a result of these complications, I may require a corneal transplant.
              * * *
VOLUNTARY CONSENT:
In signing this informed consent form, I certify that I have read the preceding information and understand its contents.  Dr. Dello Russo and his staff have answered all questions I have concerning this consent form.  I fully understand the possible risks, benefits and complications that can result from the excimer laser surgery.  My decision to proceed with [Lasik] and to participate in the surgeon's outcome analysis reporting has been voluntary and freely given.
(Slater Certification, Exhibit B, New Jersey Eye Center Informed Consent Form) (emphasis in original.)

alternative to Mrs. Hinman's Lasik surgery.[6]

Plaintiffs also argue that Defendants failed to discuss with Mrs. Hinman an alternative refractive procedure to Lasik, Radial Keratotomy ("RK"), despite listing it on the informed consent form.  Plaintiffs point out that Nurse Katzman admitted that she did not discuss RK with Mrs. Hinman (See Testimony of Joyce Katzman at 5.85:16-19), yet they fail to establish that RK was a viable alternative to Lasik for Mrs. Hinman.

Plaintiffs overlook that while presenting alternatives is crucial to obtaining informed consent, "[t]hat conclusion does not imply that a physician must explain in detail all treatment options in every case."  Matthies, 160 N.J. at 36.  The

_____

[6] Dr. Silverman testified as follows:

> Q.   Dr. Silverman, based on everything that you have reviewed in this matter . . . is there any question in your mind as to whether or not Mrs. Hinman's problems that she's described . . . [were] the result of the Lasik surgery?
> A.   There's no question this was a direct result of the Lasik surgery . . . .
> Q.   Are these conditions permanent?
> A.   Yes.
> Q.   Now, is there a surgery that could be done to try to help her?
> A.   Yes.
> Q.   Explain to the jury what could be tried on her?
> A.   This might have been a surgeon, good option for her to start also something called Lasser Assisted Clear Lens Extome [sic] . . . .

(Testimony of Cary Silverman at 2.124:18 - 2.125:23.)

reasonable patient standard governs whether the information should have been disclosed by Dr. Dello Russo. It "obligates the physician to disclose only that information material to a reasonable patient's informed decision." Id.

Since no evidence established that Mrs. Hinman was a candidate for a clear lensectomy or for RK, it would be impossible for the jury to have determined whether those procedures were medically reasonable alternatives to Lasik that Mrs. Hinman should have been made aware of. Plaintiffs argue that the New Jersey Supreme Court in Febus v. Barot held that "expert testimony is no longer required in order to establish the medical community's standard for disclosure and whether a physician failed to meet that standard." 260 N.J.Super. 322, 327 (1992). This argument misses the point. Although it is correct that no expert testimony is required to show that Mrs. Hinman should have been informed of both RK and the clear lensectomy, a jury is well within reason to disregard Plaintiffs arguments about these procedures if no evidence is presented to the jury making it clear that these procedures were viable alternatives for Mrs. Hinman.

Plaintiffs also argue that Defendants failed to disclose to Mrs. Hinman the surgical risks involved with Lasik, despite the detailed list of risks on the informed consent form initialed and signed by Mrs. Hinman. Mrs. Hinman testified that Nurse Katzman

told her to disregard some of the risks listed on the informed
consent form as being relevant only to "high risk patients" and
attempted to take Mrs. Hinman's glasses from her while she was
still reading the form, making it impossible for Mrs. Hinman to
continue reading and thus to understand the form.  (See Testimony
of Emretta Hinman at 1.22:13 - 1.23:10.)  Although she did not
specifically recall meeting Mrs. Hinman, Nurse Katzman stated she
would never have told a patient to disregard any risks.  (See
Testimony of Joyce Katzman at 5.62:3-8; 5.66:9-11.)  She also
testified that in her experience, a patient's glasses would never
have been taken during the review of the consent form because
patients needed to descend steps to get from the consultation
rooms to the pre-operative room, which would have been dangerous
for patients with vision problems to do without their glasses.
(See id. at 5.72:2-15.)

     Based on the evidence submitted at trial, a reasonable jury
could have found that Defendants offered Mrs. Hinman reasonable
alternatives and disclosed the risks of Lasik surgery.  Mrs.
Hinman acknowledged that she reviewed and signed an informed
consent form that listed several alternatives, including no
surgery and other refractive procedures, and which identified
potential complications, including night glares or halos and a

decrease in best corrected vision.[7]  (See Slater Certification, Exhibit B, New Jersey Eye Center Informed Consent Form at 1, 3, 4, 6; Testimony of Emretta Hinman at 1.77:11-13, 2.182:19 - 2.183:1.)  Dr. Dello Russo testified that the practice of the New Jersey Eye Center included patients meeting with him, technicians, and nurses to review the Lasik procedure and alternative options to the surgery.  (See Testimony of Dr. Joseph Dello Russo at 6.68:11 - 6.71:2.)  Nurse Katzman, who was in charge of obtaining patients' informed consent for Dr. Dello Russo's office, testified that she would make sure each patient, like Mrs. Hinman, read each page of the consent form prior to surgery and that the patients were informed of alternative procedures.  (See Testimony of Joyce Katzman at 5.55:7 - 12; 5.60:17 - 22; 5.77:1 - 9.)

Viewing the evidence in the light most favorable to Defendants, there was a legally sufficient evidentiary basis for the jury to conclude that a person in Mrs. Hinman's position

---

[7] Mrs. Hinman copied and initialed the following paragraph in the informed consent form:

> The doctor and his staff have fully explained the risks, benefits, and alternatives of the Lasik procedure.  I understand that depending on the laser used, Lasik is an FDA approved procedure for the correction of farsightedness [sic] and astigmatism.  All of my questions have been answered to my satisfaction.

(Slater Certification, Exhibit B, New Jersey Eye Center Informed Consent Form at ¶ 11.)

would have consented to the operation.   The jury could properly
have afforded more weight to the testimony of Nurse Katzman and
Dr. Dello Russo than to Plaintiffs' allegations that Mrs. Hinman
was told to ignore any risk of complications or was unaware of
the alternatives and risks.   (See Testimony of Emretta Hinman at
1.77:19 - 1.78:13.)

> b.   49 Diopters

_____Plaintiffs argue that Mrs. Hinman was at an increased risk
of a poor surgical outcome because her corneas required
steepening beyond 49 diopters.   In order to obtain her informed
consent, Plaintiffs contend Dr. Dello Russo should have disclosed
more information regarding the increased dangers of the
procedure.   To support their claim, Plaintiffs rely on the
testimony of their expert, Dr. Silverman.

> 1.   Conflicting Testimony

Dr. Silverman examined Mrs. Hinman approximately two years
after her Lasik procedure.   He testified that the standard of
care required Dr. Dello Russo to perform calculations to
determine the approximate corneal curvature Mrs. Hinman would
have following Lasik.   According to Dr. Silverman, the
calculations revealed that Mrs. Hinman's curvature would be
greater than 49 diopters, and that, based on those calculations,
Dr. Dello Russo should have told Mrs. Hinman that she was not a
viable candidate for Lasik because of the increased risk of post-

surgical complications caused by steep curvatures.  (See Testimony of Cary Silverman at 2.113:22 - 2.114:4.)

Plaintiffs claim that the testimony of one of Defendants' experts, Dr. Daniel Perry, also supports this argument because he testified that there is an increased risk of blurred vision, light sensitivity, glare, halos and starbursts when a cornea is steepened beyond 49 diopters.  (See Testimony of Daniel Perry at 2.79:18 - 2.80:22.)  However, Dr. Perry also testified that Mrs. Hinman's post-surgical steepness measurements are consistent with the expected measurements of a patient following a hyperopic astigmatism correction and are not overly steep.  (See id. at 2.42:6 - 2.43:2.)  He concluded that Mrs. Hinman was a "malingerer," a patient who knowingly or unknowingly changes her answers for secondary gain, because her steepness measurements are not consistent with her vision complaints,[8] and because he was unable to find any pathological grounds for her complaints. (See id. at 2.46:7-19; 2.18:3 - 2.20:6; 2.33:21-25.)

Defendants also present testimony from Dr. Jay Lippman and Dr. Dello Russo, who both disagree with the notion that steepening a cornea beyond 49 diopters poses an increased risk of post-operative complications.  Dr. Lippman's testimony clearly

_____

[8]  Dr. Perry performed an objective Opto-kinetic response test on Mrs. Hinman, which revealed that she had visual acuity in her right eye of at least 20/80.  Mrs. Hinman, however, stated that she could see only as well as someone with a visual acuity of 20/400.

14

established that there is "no magic number" for Lasik (See
Testimony of Jay Lippman at 3.21:11-23; 3.24:3-15), and that Mrs.
Hinman was an acceptable candidate for the procedure because her
degree of hyperopic astigmatism fell within the FDA-approved
guidelines for treatment with Lasik.  (See id. at 3.20:17-24.)
Dr. Lippman also testified that he "emphatically disagreed" with
Dr. Silverman's testimony that Dr. Dello Russo deviated from the
standard of care by recommending Lasik to Mrs. Hinman.  (See id.
at 3.21:24 - 3.22:14.)

Dr. Dello Russo testified that Mrs. Hinman's steepness
levels posed no increased risk for her surgery.  (See Testimony
of Joseph Dello Russo at 6.124:2-13; 6.129:3-6.)  He testified
that the so-called 49 diopters mark does not matter until the
patient is fully recovered because steepness measurements
fluctuate during the healing process.  (See id. at 6.84:5-12;
6.94:23 - 6.95:1.)  Moreover, Mrs. Hinman's final measurements
were within the targeted result range at approximately 48.50
diopters.  (See id. at 7.34:9-18.)

                    2.   The Law on Conflicting Testimony

Plaintiffs ask the Court to enter judgment in their favor
based on Dr. Silverman's testimony that steepening Mrs. Hinman's
corneas beyond 49 diopters posed an increased risk.  However, his
testimony left unresolved the importance of the 49 diopter mark.
Although he concluded there was an increased risk for Mrs.

15

Hinman, a reasonable jury could have relied on Plaintiffs'
experts who disagreed with Dr. Silverman.

When faced with conflicting testimony between expert
witnesses, the jury as fact-finder "weighs the contradictory
evidence and inferences, judges the credibility of witnesses,
receives expert instructions, and draws the ultimate conclusion
as to the facts.  The very essence of its function is to select
from among conflicting inferences and conclusions that which it
considers most reasonable." Silverii v. Kramer, 314 F.2d 407,
410 (3d Cir. 1963).  The Court is required to determine only
whether there was sufficient evidence in the record from which
the jury could reasonably make its decision.

While Plaintiffs presented only Dr. Silverman as an expert
witness, Defendants presented several expert witnesses who
testified that they disagreed with Dr. Silverman.  Defendants
also allowed the jury to hear testimony from Dr. Dello Russo
himself, who has been performing Lasik surgeries for several
years and was involved in the clinical trials leading up to Lasik
being approved by the FDA.  Moreover, Dr. Silverman admitted to
miscalculating some figures he used in assessing Mrs. Hinman, as
well as admitting to citing studies he never reviewed in a
published article, and to maintaining a website for his own eye
clinic which did not disclose the risks of the Lasik procedure.
(See Testimony of Cary Silverman at 2.127:9 - 2.146:12).  A

16

reasonable jury could have made a credibility assessment against Dr. Silverman based on this evidence.

Viewed in the light most favorable to Defendants, the Court finds that a reasonable jury could have relied on Defendants' experts and evidence in concluding that Mrs. Hinman was not an at-risk patient and that Dr. Dello Russo was therefore not required to disclose any more information to her than he would to an average patient.

### c.   Patient Information Book

The third prong of Plaintiffs' argument is that Mrs. Hinman could not give an informed consent because she was not provided with a patient information book, which was supplied to Dr. Dello Russo by the laser manufacturer.  (See Testimony of Joseph Dello Russo at 7.69:1-17.)  Plaintiffs maintain that "[t]his book was supposed to be provided to patients but was not provided to [Mrs. Hinman]."  (Plaintiffs' Br. at 8) (emphasis in original.)

Copyrighted by Summit Autonomous Inc., the Patient Information Booklet, entitled "Facts You Need To Know About LADARVision® Laser In-Situ Keratomileusis (Lasik) Surgery," provides a twenty-seven page explanation of Lasik, including expectations, precautions, and warnings for patients to consider before agreeing to surgery.[9]  (Plaintiffs' Trial Exhibit 7.)  The

---

[9]  The Patient Information Booklet is "[f]or Farsightedness (Hyperopia) With or Without Astigmatism and Mixed Astigmatism (Sphere up to +6.00D and Cylinder up to -6.00D)."  (Plaintiffs'

Patient Information Booklet provides that "[t]he safety and effectiveness of the LADARVision® system have **NOT** been established . . . [f]or treatments greater than +6.0D of hyperopia or -6.0D of astigmatism." (Id. at 15-16, 19) (emphasis in original.)  It also states that "[e]ye [sic] with greater than 5.0D of hyperopia may have lower predictability of refractive outcome and improvement in uncorrected visual acuity . . . than eyes with lower levels of hyperopia." (Id.)  The Book provides that patients considering Lasik must "[h]ave documented evidence that the change in [their] farsightedness is less than or equal to 0.50 diopter per year for at least one year prior to [their] preoperative exam." (Id. at 19.)

After admitting that he knew of and received the manufacturer's Booklet, Dr. Dello Russo gave the following testimony:

> Q:  . . . one of the things it says, "Have documented evidence that the change in your farsightedness is less than or equal to .5 zero diopter per year for at least one year prior to your pre-operative exam."  You knew that?
>
> A:  Yes.
>
> * * *
>
> A:  Comparing her old glass prescription with our refraction that day, there was no change.

───────────────────────

Trial Exhibit 7 at 1.)

                                   * * *

Q:    Did you tell Mrs. Hinman or any other
       patient you corrected for hyperopia that
       if it's over - - if it's greater than 5.
       zero diopter there may be a lower
       predictability of outcome?

A:    Exactly.

Q:    You told them that?

A:    Yes, I told anybody.

                                     * * *

Q:    You used the word, five diopters?

A:    No.

                                     * * *

Q:    Did you instruct [Nurse Katzman] to
       include on the informed consent form any
       references to the warning set forth in
       the manufacturers handbook. Yes or no?

A:    No.

                                   * * *

Q:    You got this booklet along with the
       machine that you bought for your office.
       Correct?

A:    Correct.

                                     * * *

Q:    You did not share this booklet with your
       patients, did you?

A:    It is not necessary.

Q:    I didn't ask you if it's necessary.

A:    Yes, did not.

* * *

> Q:  Did you tell any of your patients at
> this point I'm using a piece of
> equipment where the manufacturer tells
> us the safety and effectiveness has not
> been proven beyond nine months?
>
> A:   . . . no.

(See Testimony of Joseph Dello Russo at 7.69:1 - 7.76:1; 7.109:2 - 7.111:25.)

Plaintiffs provide no legal support for their claim that Dr. Dello Russo was legally mandated to provide his patients with the manufacturer's Patient Information Book.  Instead, as Plaintiffs' counsel expressed at oral argument, they request the Court to extend malpractice liability for failure to obtain informed consent to physicians that "fail[] to advise of the precautions and the candidacy issues set forth in [a manufacturer's information] book. . . ."  (Plaintiffs' Brief at 9.)  The Court rejects Plaintiffs' legally baseless argument as grounds for discarding the jury's verdict.

Plaintiffs failed to explain how Dr. Dello Russo's decision not to furnish the Book was the proximate cause of Mrs. Hinman's injuries.  Largey, 110 N.J. at 215; Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 548 (2002).  Plaintiffs never established through their expert's testimony the significance of the Patient Information Book or that providing it to Mrs. Hinman would have allowed her to give informed consent.  Plaintiffs left

20

uncontroverted Dr. Dello Russo's explanation that it was
unnecessary to provide the materials to his patients.

Dr. Dello Russo's decision not to give Mrs. Hinman the Book
did not make her an at-risk patient, and as established above,
the jury had sufficient grounds to decide that she was provided
enough information regarding risks and alternatives.  The jury
had sufficient evidence to disregard the issue of the Patient
Information Book as irrelevant; therefore, the Court has no
justification to enter judgment in Plaintiffs favor.


    2.   <u>Standard of Care</u>

Plaintiffs argue that because Defendants "did not offer <u>any</u>
competent testimony to rebut the allegation . . . that the
standard of care was breached . . . a judgment of liability
should be entered as a matter of law." (Plaintiffs' Brief at 10)
(emphasis in original.)  Plaintiffs rely on <u>Sanzari v. Rosenfeld</u>
and <u>Vitrano by Vitrano v. Schiffman</u> to support their claim that
Defendants' experts' testimony amounted to no more than "a net
opinion" and did not rebut the allegation that Dr. Dello Russo
breached the standard of care.  34 N.J. 128, 134-35 (1961); 305
N.J. Super. 572, 577 (App. Div. 1997).

Plaintiffs' argument lacks merit.  First, informed consent
is a negligence concept, which requires "<u>a plaintiff [to] show
the physician failed to comply</u> with the reasonably-prudent-

patient standard for disclosure." <u>Howard</u>, 172 N.J. at 549
(emphasis added and internal quotations and numbers omitted).  In
other words, Plaintiffs needed to first establish what the
standard of care was and that Dr. Dello Russo breached that
standard <u>before</u> the burden shifted to Defendants to rebut that
evidence.  Plaintiffs provide no evidentiary support that this
*prima facie* element was satisfied, but instead provide merely
bald statements that Defendants did not rebut the allegation.
<u>Id.</u>

    Second, <u>Vitrano</u> and <u>Sanzari</u> are inapposite.  Plaintiffs
essentially argue that because Dr. Lippman used the term
"conventional wisdom," his testimony amounted to a "net opinion"
rather than an informed opinion regarding whether the standard of
care was breached.  In ruling on the issue of a "net opinion,"
the <u>Vitrano</u> court concluded that "bare conclusion[s] unsupported
by factual evidence" are inadmissible, which, as examined below,
is not the case here.  <u>Vitrano</u>, 305 N.J. Super. at 577.
(internal quotations omitted).  Moreover, the <u>Sanzari</u> court was
not talking about a defendant's burden, but the plaintiffs: "<u>if
the plaintiff does not advance expert testimony establishing an
accepted standard of care</u>, it is proper for the court to grant a
dismissal at the close of <u>plaintiff's</u> case." <u>Sanzari</u>, 34 N.J. at
135 (emphasis added).

    The third reason Plaintiffs' contention fails is because it

completely misconstrues Dr. Lippman's testimony.[10]  Dr. Lippman testified that Mrs. Hinman was an acceptable candidate for Lasik because her degree of astigmatism was within the guidelines set forth by the FDA for such treatment.  (See Testimony of Jay Lippman at 3.20:17-24.)  He "emphatically disagree[d]" with Dr. Silverman's statement that Dr. Dello Russo deviated from the standard of care by recommending Lasik.  (See id. at 3.21:24 - 3.22:14.)

_____

[10]   Dr. Lippman testified:
> A:   I disagree with many of Doctor Silverman's conclusions.  I think that there is no magic number and even though again conventional wisdom suggests that we ought to steepen the cornea beyond 50 diopters let's say.  What I'm saying hear [sic] is, a cornea which has been steepened, this is what the doctor intended to do.  This is the way the compound hyperopic astigmatism is treated, by steepening the two principle miridian [sic].  Different amounts but both being steepened.  Her ultimate outcome appears that her potography [sic] is in normal limits.  I don't understand Doctor Silverman's point.
> Q:   Doctor, assume also Dr. Silverman testified an stated in his report that he prepared, written report, that Dr. Dello Russo clearly deviated from the standard of care by recommending Lasik. Do you agree or disagree with Doctor Silverman's opinion in that regard?
> A:   I emphatically disagree.
> Q:   Can you explain to the jury why you "emphatically" disagree?
> A:   . . . from what I can see the surgery as conceptualized and performed was entirely appropriate.
(Testimony of Jay Lippman at 3.21:13 - 3.22:14.)

23

Plaintiffs misconstrue Dr. Lippman's testimony and there was sufficient evidence upon which a reasonable jury could decide that Defendants did not breach the applicable standard of care.

B.   Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

The court should order a new trial if "a miscarriage of justice would result if the verdict were to stand." Delli Santi v. CNA Insurance Companies, 88 F.3d 192, 201 (3d Cir. 1996) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992)).  The standard for granting a new trial is substantially less demanding than that for judgment as a matter of law.  See 9A Charles A. Wright & Arthur A. Miller, Federal Practice and Procedure § 2531, at 302 (1995).  In fact, contrary to the lack of discretion that a trial court has when ruling on a motion for judgment as a matter of law, a trial court is vested with wide discretion when it rules on a motion for a new trial. Id.  This discretion is exemplified by the fact that in ruling on a motion for a new trial, the trial court is permitted to consider the credibility of the witnesses and weigh the evidence. Id.  Such deference is appropriate because the district court is

able to observe the witnesses and follow the trial in a way that an appellate court cannot replicate by reviewing the record. Roebuck v. Drexel Univ., 852 F.2d 715 (3d Cir. 1988) (quoting Semper v. Santos, 845 F.2d 1233, 1237 and n.35 (3d Cir. 1988)).

The discretion of the court, however, is not unlimited. Although the court is permitted to consider the credibility of witnesses and to weigh the evidence on a new trial motion, the court must "exercise restraint to avoid usurping the jury's primary function." Hurley v. Atlantic City Police Dept., 933 F. Supp. 396, 403 (D.N.J. 1996), aff'd 174 F.3d 95 (3d Cir. 1999), cert. denied 120 S.Ct. 786 (2000).

Based on the testimony discussed above, the Court finds that the verdict bears a rational connection to the evidence; therefore, a new trial is not warranted.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for judgment as a matter of law or for a new trial are **denied**.

An appropriate Order follows.


 /S/ WILLIAM G. BASSLER
WILLIAM G. BASSLER, U.S.S.D.J.

Dated: August 2, 2006